In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10168

_____

STATE OF WEST VIRGINIA, by and through Patrick Morrisey,
Attorney General of the State of West Virginia,
STATE OF ALABAMA, by and through Steve Marshall,
Attorney General of the State of Alabama,
STATE OF ARKANSAS, by and through Leslie Rutledge,
Attorney General for the State of Arkansas,
STATE OF ALASKA, by and through Treg R. Taylor,
Attorney General of the State of Alaska,
STATE OF FLORIDA, by and through Ashley Moody,
Attorney General for the State of Florida,
STATE OF IOWA,
STATE OF KANSAS, by and through Derek Schmidt,
Attorney General for the State of Kansas,
STATE OF MONTANA, by and through Austin Knudsen,
Attorney General of the State of Montana,
STATE OF NEW HAMPSHIRE,

2                          Order of the Court                     22-10168

STATE OF OKLAHOMA, by and through Mike Hunter,
Attorney General of the State of Oklahoma,
STATE OF SOUTH CAROLINA, by and through Alan Wilson,
Attorney General of the State of South Carolina,
STATE OF SOUTH DAKOTA, by and through Jason R. Ravnsborg,
Attorney General of the State of South Dakota,
STATE OF UTAH, by and through Sean Reyes,
Attorney General of the State of Utah,

                                                    Plaintiffs-Appellees,

*versus*

U.S. DEPARTMENT OF THE TREASURY,
SECRETARY, U.S. DEPARTMENT OF THE TREASURY,
ACTING INSPECTOR GENERAL OF THE
DEPARTMENT OF THE TREASURY,

                                                    Defendants-Appellants.

——————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:21-cv-00465-LSC

——————————————

22-10168                  Order of the Court                  3

Before WILLIAM PRYOR, Chief Judge, WILSON, JORDAN, ROSENBAUM, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, BRASHER, and ABUDU, Circuit Judges.*

BY THE COURT:

A petition for rehearing having been filed and a member of this Court in active service having requested a poll on whether this appeal should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting rehearing en banc, IT IS ORDERED that this appeal will be not be reheard en banc.

---

* Judge Jill Pryor recused herself and did not participate in the en banc poll.

22-10168          BRASHER, J., Concurring          1

BRASHER, Circuit Judge, concurring in the denial of rehearing en banc:

This appeal is about Section 802(c) of the American Rescue Plan Act. *See* American Rescue Plan Act of 2021, Pub. L. 117-2, 135 Stat. 4. The Rescue Plan appropriated over two hundred billion dollars to the states to mitigate the economic and public health effects of the coronavirus pandemic. The Rescue Plan has some important provisos. Relevant here, states that accept relief funds cannot "either directly or indirectly offset a reduction in the[ir] net tax revenue" that occurs because of a tax cut. 42 U.S.C. § 802(c)(2)(A). Thirteen states sought a declaratory judgment and an injunction to prevent the Secretary of the Treasury from enforcing the offset provision. The states argued that the offset provision violated the Spending Clause and the Tenth Amendment's anti-commandeering doctrine, and the district court permanently enjoined the offset provision's enforcement.

The Supreme Court has said that Congress can add a condition to states accepting federal funds only if it speaks "unambiguously" and "with a clear voice" so that the States can "exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). After a straightforward application of the Supreme Court's Spending Clause jurisprudence and this Court's related precedent in *Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004), the panel held that the tax offset provision was unconstitutionally unascertainable under the Spending Clause, without addressing the states' coercion

2                    BRASHER, J., Concurring                    22-10168

and Tenth Amendment claims. *West Virginia v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1148 (11th Cir. 2023). The main problem, we said, is that "the offset provision does not provide a standard against which a state can assess whether it will reduce or has reduced net tax revenue . . . . Reduced as compared to what?" *Id.* at 1144. This problem is exacerbated by the fungibility of money and the provision's expansive prohibition on even "indirectly" offsetting a tax cut with Rescue Plan funds. The panel also held that the Secretary's interim final rule could not salvage the offset provision's constitutional defects. *Id.* at 1146–49. So we affirmed the decision of the district court.

A majority of the active judges on this Court has determined not to hear this case en banc. This result is hardly surprising. *See* Fed. R. App. P. 35(a). The only other circuit court to have reached the merits of this dispute, the Sixth Circuit, has agreed with the panel opinion that the Rescue Plan's offset provision is "impermissibly vague under the Spending Clause." *Kentucky v. Yellen*, 54 F.4th 325, 330 (6th Cir. 2022). And almost every district court to have considered the issue has reached a similar conclusion. *See Texas v. Yellen*, 597 F. Supp. 3d 1005, 1012–15, 1019 (N.D. Tex. 2022); *Ohio v. Yellen*, 547 F. Supp. 3d 713, 740 (D. Ohio 2021). Although the government asked the Sixth Circuit to reconsider its decision, it did not petition for review in the Supreme Court. So the issue seems to be resolved.

Because the unconstitutionality of the offset provision seems settled, I'll pretermit the usual back-and-forth with my

22-10168               BRASHER, J., Concurring                    3

dissenting colleague. The panel issued its opinion in January, and it is now September. My dissenting colleague has used some of that time to write her own opinion, which was presumably complicated by the government's failure to make the statutory-interpretation arguments on which she relies. *E.g.*, Oral Argument Trans. No. 22-10168 at 9:46 (government conceding that "[t]he statute doesn't answer how you calculate a reduction"). I'm not persuaded, but I don't see a need to further delay the case to prepare my own point-by-point rebuttal. So I'll let the panel opinion speak for itself.

22-10168            ROSENBAUM, J., Dissenting            1

ROSENBAUM, Circuit Judge, dissenting from the denial of re-hearing en banc:

A builder arrives on site to build a new three-bedroom house. She carries with her a complete complement of all her tried and trusty tools. But when she gets down to building, she and her crew pull out only a flathead screwdriver and attempt to use that—and only that—to build the house. Worse still, after a bit, she and the crew decide to stop using even that tool, even though the plans call for the use of more flathead screws. Instead of turning to her other tools for the rest of the project, she simply declares, "It's impossible to build this house!" Then, she refuses to consult the home-building expert of the company that designed the house and instead firebombs the building site.

The panel opinion here engaged in the statutory-interpretation equivalent of what this builder did. The Supreme Court has told us that "before concluding that a [statute] is genuinely ambiguous, a court *must* exhaust *all* the 'traditional tools' of construction." *Kisor v. Wilkie,* 139 S. Ct. 2400, 2415 (2019) (emphases added).[1] Yet charged with construing part of the American Rescue

_____

[1] *Kisor* addresses the problem of ambiguity in agency regulations. But the Court was clear that its approach to ambiguity in regulations was precisely the same as its approach to ambiguity in statutes. *See Kisor,* 139 S. Ct. at 2415 (citing *Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.,* 467 U.S. 837, 843, n.9 (1984), for the proposition that the Court has "adopt[ed] the same approach" of exhausting all the "traditional tools" of construction for statutory interpretation); *see also Abramski v. United States,* 573 U.S. 169, 179 (2014) (noting that courts "*must* . . . interpret the relevant words [of a statutory provision] not in a vacuum, but with reference to the statutory context, structure, history, and

2                    ROSENBAUM, J., Dissenting                22-10168

Plan Act ("Rescue Plan") (in which Congress authorized participating states to receive billions of dollars in COVID-19-related financial relief), the panel opinion looked up the dictionary definitions of three of the 80-plus words[2] in the statutory provision, found that those definitions in isolation did not answer the question before the Court, and threw in the towel, proclaiming the provision unascertainable. The panel opinion didn't consider the statutory context, the statutory purpose as derived from the text, the statutory structure, or the statutory history. And it didn't even bother to look up all the significant words in the statutory text before declaring defeat. Nor did the panel opinion's strained finding of ambiguity comport with common sense. In fact, it's demonstrably implausible.

Then, the panel opinion used this demonstrably implausible construction of the statutory provision at issue as its sole basis for invoking the major questions doctrine. As a result, the panel opinion refused to even consider the Secretary's duly promulgated regulation. And it did this even though the Rescue Plan expressly endowed the Secretary of the Treasury with the authority to promulgate rules as necessary under the governing statute.

---

purpose" of the law, "not to mention common sense." (cleaned up) (emphasis added)).

[2] And that doesn't include a word count of the statutorily defined phrase in the provision, which, as I explain later, also requires statutory interpretation. *See* 42 U.S.C. § 802(g)(1).

22-10168               Rosenbaum, J., Dissenting                3

These errors have extraordinary implications for the law and our Circuit precedent.  The first—declaring a statutory provision unascertainable or ambiguous without emptying the statutory-interpretation toolbox—directly contravenes what the Supreme Court has told us about how we must conduct statutory interpretation.  It also introduces confusion and uncertainty into our statutory-interpretation methodology.  The second—wheeling out the major-questions-doctrine big gun both to make sure an ascertainable statutory provision is really dead and to sideline the expert Congress charged with administering the provision—effects an impermissible judicial snatch-and-grab of congressional power.  Indeed, the panel opinion's extension of the major questions doctrine upsets the separation of powers, effectively giving courts an unconstitutional veto on Congress's policy decisions any time courts disagree with Congress's legislation and the legislation authorizes the expenditure of large amounts of money.

Even worse, these errors are unforced.  Had the panel opinion cracked the statutory-interpretation toolbox open and exhausted all its tools, the panel opinion would have concluded that the Rescue Plan provision at issue is ascertainable.

Yet even today, though Judge Brasher's opinion concurs separately in the denial of rehearing en banc, it offers no substantive response to the errors I point out in the panel opinion he authored.  Instead,   the   Brasher   Concurrence   says   simply   that   the

4                    ROSENBAUM, J., Dissenting                    22-10168

"government conced[ed] that '[t]he statute doesn't answer how you calculate a reduction."[3]  Conc. at 3.  But that's no answer.

Of course, we greatly appreciate the parties' briefing and arguments and closely consider them.  But we have never let the parties decide the case for us.  To the contrary, we have always explained that "the Government cannot concede away the proper interpretation of a statute."  *Bourdon v. U.S. Dep't of Homeland Sec.*, 940 F.3d 537, 547 n.6 (11th Cir. 2019).[4]  And that is especially the

---

[3] The Brasher Concurrence also blames its failure to respond substantively on the fact that "[t]he panel issued its opinion in January, and it is now September."  Conc. at 2–3.  And to be sure, speed in the issuance of opinions is important.  But so is getting the answer right under the law.  That's why the only thing unusual about the amount of time the en banc process has taken here is that it's been significantly shorter than usual.  *See, e.g.*, *Laufer v. Arpan LLC*, 65 F.4th 615 (11th Cir. Apr. 12, 2023) (en banc) (denying rehearing en banc rehearing on panel opinion issued on March 23, 2022); *Johnson v. NPAS Sols., LLC*, 43 F.4th 1138 (11th Cir. Aug. 3, 2022) (en banc) (denying rehearing en banc on panel opinion issued on Sept. 17, 2020); *Otto v. City of Boca Raton*, 41 F.4th 1271 (11th Cir. July 20, 2022) (en banc) (denying rehearing en banc on panel opinion issued on Nov. 20, 2020); *United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730 (11th Cir. Dec. 22, 2021) (en banc) (denying rehearing en banc on panel opinion issued on Sept. 17, 2019).  *See also* Robin S. Rosenbaum, *Foreword*, 77 U. Miami L. Rev. 885, 886–87 (2023) (noting that en banc is "[a] lengthy process").  In any case, and most respectfully, the fact that "it is now September" hardly seems like a good reason not to respond substantively.

[4] *See also United States v. Colston,* ("Concessions of law . . . are never binding on [the court of appeals].");  *Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1255 (11th Cir. 2015) (Carnes, J., dissenting) (acknowledging that "[t]he interpretation of a statute is a question of law, . . . and we are not obliged to accept a party's concession on such questions");  *Rumsfeld v. F. for Acad. & Institutional*

22-10168          ROSENBAUM, J., Dissenting          5

case when we're talking about invalidating a provision in a multi-billion-dollar act of Congress. It's also another reason why en banc rehearing is warranted here: so we can ask the parties about these errors and benefit from the parties' thoughts on them.

In short, the panel opinion is profoundly wrong and will have serious consequences for our jurisprudence. I respectfully dissent from the denial of rehearing en banc.

I organize this opinion in three substantive parts. In Section I, I explain the relevant statutory background and the question at issue in this case. Section II shows that our statutory-interpretation toolbox readily provides the answer to the question here. And in Section III, I discuss why invocation of the major questions doctrine is inappropriate and how this case's extension of the doctrine upsets the separation of powers.

## I.

### A.    *Statutory Background*

By March 2021, roughly a year into the COVID-19 pandemic, the pandemic had wreaked havoc on American families, companies, and the economy. To "mitigate the fiscal effects stemming from the public health emergency with respect to [COVID-19]," 42 U.S.C. § 802(a)(1), Congress enacted the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4. As part of the

_____

*Rts., Inc.*, 547 U.S. 47, 56 (2006) (stating that courts need not "accept an interpretation of a statute simply because it is agreed to by the parties.").

Rescue Plan, Congress allocated $219.8 billion to states, territories, and tribal governments.

No state was required to accept Rescue Plan funds. But if a state chose to do so, the money came with conditions: any state receiving Rescue Plan funds had to use the federal money in ways that the statute permitted and had to refrain from using the funds in ways the law prohibited. *See* 42 U.S.C. § 802(c).

The Rescue Plan set forth five broad categories of permissible uses for the funds: (1) "to respond to the [COVID-19] public health emergency . . . or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality," *id.* § 802(c)(1)(A); (2) "to respond to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers of the State . . . that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work," *id.* § 802(c)(1)(B); (3) "for the provision of government services" up to a certain amount, *id.* § 802(c)(1)(C); (4) "to make necessary investments in water, sewer, or broadband infrastructure," *id.* § 802(c)(1)(D); and (5) "to provide emergency relief from natural disasters or the negative economic impacts of natural disasters, including temporary emergency housing, food assistance, financial assistance for lost wages, or other immediate needs," *id.* § 802(c)(1)(E). Unsurprisingly, given the Rescue Plan's express statement of its purpose, each of these areas addressed a financial

22-10168          ROSENBAUM, J., Dissenting          7

concern exacerbated by COVID-19.  And none permitted a state to use the money to fund state tax cuts.

In case any state missed that last point, the Rescue Plan explicitly made it in the section of the statute delineating prohibited uses of Rescue Plan funds.  As relevant here, the Rescue Plan directed that no state could use Rescue Plan funds "to either directly or indirectly offset a reduction in the net tax revenue of such State . . . resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise)" or to delay "the imposition of any tax or tax increase." *Id.* § 802(c)(2)(A).  This provision—section 802(c)(2)(A)—is the one that is at the center of our case.

The Rescue Plan then emphasized the limited purpose of its funds for COVID-19-related uses, not for states to fund their own tax cuts.  It required, "for a State . . . to receive a payment . . . , the State shall provide the Secretary with a certification, signed by an authorized officer of such State . . . , that such State . . . requires the payment . . . to carry out the activities specified in subsection (c) of this section and will use any payment under this section . . . , in compliance with subsection (c) of this section." *Id.* § 802(d)(1). And if any state violated these rules, the Rescue Plan required the Secretary to recoup "an amount equal to the amount of funds used in violation of [subsection (c)] . . . ." *Id.* § 802(e).

B.     *The Lawsuit*

8                    ROSENBAUM, J., Dissenting                    22-10168

Three weeks after the Rescue Plan became law, thirteen states sued. They argued that section 802(c)(2)(A)—the prohibition on using Rescue Plan money to fund state tax cuts—was unconstitutional because it allegedly required the states to either give up control of a "core function of their inherent sovereign powers"—their taxing authority, namely, the power to lower taxes—or "forfeit massive and much-needed aid that represent[ed] approximately 25% of Plaintiff States' annual general budgets." Pointing to the language "directly or indirectly" in section 802(c)(2)(A), the States asserted that the standard the Rescue Plan imposed for determining whether a use of funds violated the prohibition on tax cuts was unascertainable. So, the States argued, the Secretary could seek to recoup money for any tax cut whatsoever, regardless of whether the State used Rescue Plan money to fund it. In short, the States said that the law was impermissibly overbroad, impermissibly vague, or both.

### C.     The Regulation

No long after the States sued, the Secretary promulgated a regulation establishing a step-by-step process for determining "whether, and the extent to which, [Rescue Plan] funds have been used to offset a reduction in net tax revenue" under Section 802(c)(2)(A).[5]  87 FED. REG. 4338-01, 4423 (Jan. 27, 2022). The rule sets out a four-step process for determining whether a state's

---

[5] The interim rule was announced in May 2021 and was finalized in January 2022 with no material change. 87 FED. REG. 4338-01 (Jan. 27, 2022).

22-10168               ROSENBAUM, J., Dissenting                9

expenditure of Rescue Plan money violates the tax-cut-funding prohibition.

First, the state must identify and value all modifications of law, regulation, or administrative interpretation that lower net tax revenue, "as it would in the ordinary course of its budgeting process." *Id.* "The sum of these values in the year for which the government is reporting is the amount that it needs to 'pay for' with sources other than [Rescue Plan] funds . . . ." *Id.*

Second, the state must compare its net tax revenue recorded for any given year after the fiscal year ending 2019 to the amount of net tax revenue recorded for the fiscal year ending 2019. If the later year's net tax revenue is greater than that for the fiscal year ending 2019—adjusted annually for inflation—then the state has complied with the prohibition. *Id.* The regulation also includes a safe harbor: if the total decrease in net tax revenue is *de minimis*—meaning less than one percentage point—then the state has also complied. *Id.*

Third, if the amount of net tax revenue recorded is less than for the fiscal year ending 2019 (and falls outside the safe harbor)—adjusted annually for inflation—then the state must identify sources of funds that offset the reduction, such as spending cuts or tax increases. *Id.*

And fourth, recipient states must calculate "the value of revenue reduction remaining . . .—that is, how much of the tax change has not been paid for." *Id.* So if a state's tax revenue goes down in one area, but the state's spending goes down by the same

amount or the state increases taxes elsewhere to account for that decrease, then the state has complied. *Id.* If a shortfall remains, though, the formula isolates that shortfall in net tax revenue resulting from a tax cut or delayed tax increase that the state's non-Rescue Plan budget does not pay for. In other words, it identifies any portion of Rescue Plan funds that the state received that it used to cover a shortfall in net tax revenue caused by a tax cut or delayed tax increase.

Besides promulgating this rule, the Secretary also responded to some states' expressed concerns that predicting the effect that a state's change in tax code would have on tax revenue was hard to do. She pointed out that states already took this sort of information into account in their existing fiscal and budgeting processes. *Id.* at 4424 ("By incorporating existing budgeting processes and capabilities, states and territories will be able to assess and evaluate the relationship of tax and budget decisions to uses of [Rescue Plan] funds based on information they likely have or can readily obtain. This approach ensures that recipient governments have the information they need to understand the implications of their decisions regarding the use of [Rescue Plan] funds[.]").

### D.    The Panel Opinion

The district court permanently enjoined the Secretary from recouping Rescue Plan money that states spent funding tax cuts in violation of the law. *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124 (11th Cir. 2023). And the panel opinion affirmed.

In reaching this conclusion, the panel opinion discussed the dictionary definitions of three words in section 802(c)(2)(A)—the Rescue Plan's prohibition on using Rescue Plan funds for state tax cuts—and declared the provision unascertainable. After considering only these three dictionary definitions, the panel opinion said, as relevant here, that the prohibition on funding tax cuts with Rescue Plan funds (1) didn't provide a standard by which to measure whether tax revenue had increased or decreased, so states couldn't know whether their actions violated the provision; and (2) didn't define "direct or indirectly offset," and a broad definition of "indirectly offset" could apply to anything. *Id.* at 1144–45. The panel also opined that the Rescue Plan's "novelty and scope" compounded these perceived problems. *Id.* at 1145–46.

Having declared the Rescue Plan's prohibition on the use of Rescue Plan money to fund state tax cuts unascertainable, the panel opinion then refused to consider the merits of the Treasury regulation to clear up any alleged ambiguity. *Id.* at 1146. To justify this decision, the panel opinion incorrectly reasoned that the prohibition on using Rescue Plan money to fund state tax cuts could be read to prohibit states from making any tax cuts whatsoever. *Id.* at 1147. And because any "choice" between that (implausible) interpretation and a narrower one was a question for Congress, the panel opinion concluded, the major questions doctrine came into play. *Id.* at 1146–47. As a result, the panel opinion removed the Secretary's ability to weigh in on the provision with regulations. *Id.* Continuing, the panel opinion said that Congress couldn't delegate to the Executive the power to place conditions on grants because

Congress, not the Executive, has the power of the purse, and a delegation of that nature would infringe on the separation of powers. *Id.* at 1147–48. Ironically, though, as I explain below, the panel opinion effectively allowed the Judiciary to act as a veto on Congress's policy determination that Rescue Plan money was to be used for addressing only pandemic-related expenses, not for funding state tax cuts.

Further in line with a judicial rewrite of the statute, after declaring the tax-cut-prohibition provision invalid, the panel opinion affirmed the district court's injunction of the prohibition but left the rest of the Rescue Plan intact. *Id.* at 1149. In other words, the panel opinion enabled states to accept and spend billions of dollars in Rescue Plan money and freed them from their corresponding and voluntarily accepted Rescue Plan obligation to spend those funds to address only pandemic-exacerbated conditions, not to fund state tax cuts.

## II.

I first explain why the panel opinion was wrong to declare the prohibition on using Rescue Plan money to fund state tax cuts (section 802(c)(2)(A)) unascertainable. But because our statutory-interpretation exercise arises in the context of a Spending Clause challenge, I begin with a brief discussion of that constitutional provision.

Article I, Section 8, of the Constitution contains what is known as the Spending Clause. That section gives Congress the power to "lay and collect Taxes, Duties, Imposts, and Excises, to

22-10168          ROSENBAUM, J., Dissenting          13

pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art I, § 8.

The Spending Clause endows Congress with "broad power . . . to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1568 (2022). In describing these powers, the Supreme Court has said that when Congress enacts legislation under the Spending Clause, that legislation "is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). But for spending-power legislation to be valid, it must allow states to knowingly and voluntarily "accept[] the terms of the 'contract.'" *Id.*

That means, as relevant here, that a state must be able to ascertain what conditions Congress has placed on the federal funds it offers. *Id.* So "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously" (meaning ascertainably). *Id.*

That brings us to one of the reasons I write today: the issue of ambiguity. In recent years, the Supreme Court has had a lot to say about ambiguity (or lack of it) in the law. The bottom line is this: "before concluding that a [statute] is genuinely ambiguous, a court *must* exhaust *all* the 'traditional tools' of construction." *Kisor*, 139 S. Ct. at 2415 (emphases added). Those tools include examining the text, "statutory context, structure, history, and purpose" of

14                    ROSENBAUM, J., Dissenting                    22-10168

the law, "not to mention common sense." *Abramski*, 573 U.S. at 179 (cleaned up).

The Supreme Court has repeatedly reminded us that statutory interpretation is not for quitters. In *Kisor*, the Court said that "a court cannot wave the ambiguity flag just because it found the [statute] impenetrable on first read." 139 S. Ct. at 2415. Indeed, the Court has recognized that "hard interpretive conundrums, even relating to complex [statutes], can often be solved." *Id.* at 2415. As the Court has remarked, while "[d]ifficult ambiguities in statutory text will inevitably arise, … [c]ourts should approach these interpretive problems methodically, using traditional tools of statutory interpretation, in order to confirm their assumptions about the 'common understanding' of words." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 n.5 (2021). Even if "discerning the only possible interpretation" of a law "requires a taxing inquiry," that does not render the law ambiguous. *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting) (discussing a regulation). Rather, "if a reviewing court employs all of the traditional tools of construction, the court will almost always reach a conclusion about the best interpretation of the law at issue." *Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring) (cleaned up).

The Supreme Court could not be clearer in commanding courts that they must empty the statutory-interpretation toolbox before concluding a statute is genuinely ambiguous. Yet the panel opinion barely even cracked the toolbox's lid before slamming it shut and locking it. As I've noted, the panel opinion looked at only

22-10168          Rosenbaum, J., Dissenting          15

three dictionary definitions for isolated words, gave up, and declared the provision unascertainable.  Had the panel opinion rolled up its sleeves and exhausted the statutory-interpretation toolbox, it could not have found the prohibition on using Rescue Plan money to fund state tax cuts ambiguous.

As it turns out, Congress set forth an ascertainable standard when it prohibited states that choose to accept Rescue Plan funds from using those funds "to either directly or indirectly offset a reduction in the net tax revenue of such State . . . resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax . . . or delays the imposition of any tax or tax increase."  42 U.S.C. § 802(c)(2)(A).  At the risk of ruining the ending, I disclose that standard up front:  states may not use Rescue Plan funds to ultimately pay for a reduction in the state's net tax revenue (as compared to the state's net tax revenue in the state's last full fiscal year before the United States declared the COVID-19 emergency) caused by a tax cut or delayed tax implementation.  When we examine the text, "statutory context, structure, history, and purpose" of the law, "not to mention common sense," *Abramski*, 573 U.S. at 179 (cleaned up), as the Supreme Court has told us to do, they necessarily reveal this standard.

### A.    *The Text*

In statutory interpretation, of course, we always begin with the text.  *Ross v. Blake*, 578 U.S. 632, 638 (2016).  The statute here provides,

> A State . . . shall not use [Rescue Plan] funds . . . to either directly or indirectly offset a reduction in the net tax revenue of such State . . . resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

42 U.S.C. § 802(c)(2)(A).

The Rescue Plan defines some terms, one of which is relevant to our interpretation of section 802(c)(2)(A): "covered period." As the Rescue Plan explains, "covered period" refers to the period that starts on March 3, 2021 (when the Rescue Plan was enacted), and "ends on the last day of the fiscal year of [the participating] State . . . government in which all funds received by the State . . . from a payment made under this section . . . have been expended or returned to, or recovered by, the Secretary." 42 U.S.C. § 802(g)(1). This definition provides important information that comes into focus once we look at other text in section 802(c)(2)(A). So I discuss it more later. But for now, the important point is that we must read this definition together with the rest of section 802(c)(2)(A)'s prohibition on using Rescue Plan money to fund state tax cuts, since section 802(c)(2)(A) incorporates the definition of "covered period" into its text.

As for the definitions of the rest of the words in section 802(c)(2)(A), we give terms their "ordinary public meaning" at the

22-10168          ROSENBAUM, J., Dissenting                    17

time the statute was adopted. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1741, 738–39 (2020). I consider the meaning of the words in the order they arise in section 802(c)(2)(A).

The statute begins, "A state . . . shall not." We've said that "the verb 'shall' in a statute is a command." *United States v. Peters*, 783 F.3d 1361, 1364 (11th Cir. 2015). So "shall not" is a command to not do something—that is, a prohibition. In this case, it's a prohibition on the "use" of something. And since the next part of the statute refers to only Rescue Plan funds ("A State . . . shall not use [Rescue Plan] funds"), the plain text of section 802(c)(2)(A) tells states that it is a prohibition on only how they may spend Rescue Plan funds, not on how they may spend money from any other source.[6]

Next up, we have the phrase "to either directly or indirectly offset." To discern the meaning of this phrase, we consult dictionaries in use when Congress enacted the Rescue Plan in 2021. *Thompson v. Regions Sec. Servs., Inc.*, 67 F.4th 1301, 1306 (11th Cir. 2023). No dictionaries appear to define the entire phrase. So we turn to the meanings of the individual words in the phrase. *United States v. Dominguez*, 997 F.3d 1121, 1124 (11th Cir. 2021).

---

[6] In fact, section 802(c)(2)'s heading is "Further restriction on use of funds," referring to Rescue Plan funds and underscoring the point that section 802(c)(2) is a limitation on how *Rescue Plan funds* may be spent. *See United States v. Bryant*, 996 F.3d 1243, 1257 (11th Cir. 2021) ("Titles are permissible indicators of meaning." (cleaned up)).

"Directly" means "[i]n a straightforward manner." *Directly*, BLACK'S LAW DICTIONARY (11th ed. 2019). "Indirectly" occupies the rest of the field that "directly" doesn't cover: "deviating from a direct line or course : not proceeding straight from one point to another : proceeding obliquely or circuitously," "not straightforward and open," and "not directly aimed at or achieved." *Indirect*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY (Sept. 12, 2023), https://unabridged.merriam-webster.com/unabridged/indirect [https://perma.cc/T7BK-4GTC]. As for "offset," according to *Black's Law Dictionary*, that means "[s]omething (such as an amount or claim) that balances or compensates for something else." *Offset*, BLACK'S LAW DICTIONARY (11th ed. 2019).

So to "directly or indirectly offset" means to compensate, or pay, for a loss with no intermediate steps, or to make up for that loss with intermediate steps between the initial action and the result. And when we put this together with the prohibitory language at the beginning of the provision, it's clear that Congress was instructing states that they could not use Rescue Plan funds directly—or circumvent the prohibition on the use of Rescue Plan funds by using those funds indirectly—to effectively pay for something.

So what does the statute prohibit states from using Rescue Plan funds to pay for? The rest of section (c)(2)(A) tells us: "a reduction in the net tax revenue of such State . . . resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a

22-10168                ROSENBAUM, J., Dissenting                19

reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase." That's a mouthful, so let's break it down.

We all know what a "reduction" is, but in the interest of completeness, here's a dictionary definition: "a decrease in size, amount, extent, or number." *Reduction*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY (Sept. 12, 2023), https://unabridged.merriam-webster.com/unabridged/reduction [https://perma.cc/HT9R-9SFS]. Two things about the meaning of "reduction" become important in our analysis. First, as the definition indicates, "reduction" is inherently a comparative word. For something to be a decrease, or smaller, we must compare it to something else that is bigger. Second, and along the same lines, something that doesn't already exist can't be reduced. So when we speak of a "reduction," the thing we are comparing it to must already exist. The comparative nature of the word "reduction" is key as we proceed further through the text.

In the meantime, though, we consider the phrase "net tax revenue." Start with "tax revenue"—the "total income produced" from taxes. *Revenue*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY (Sept. 12, 2023), https://unabridged.merriam-webster.com/unabridged/revenue [https://perma.cc/NX3U-XAMK].

Then add the adjective "net." "Net" means "[t]he final amount remaining after all other amounts have been taken away; esp., an amount of money remaining after a sale, minus any deductions for expenses, commissions, and taxes." *Net*, BLACK'S LAW

DICTIONARY (11th ed. 2019).  Taken together, "net tax revenue," followed by "of such State," refers to the total tax income that a state collects, minus any losses or expenses.

It's worth noting that "net" does a lot of work in this phrase. It indicates that Congress was talking about the total tax revenue *after* all accounting has been done.  In other words, Congress was not concerned with tracing specific Rescue Plan dollars through their expenditure lives.  Rather, Congress sought to ensure only that, after all was said and done, none of the participating state's total Rescue Plan allotment *ultimately* funded state tax cuts—whatever other detours the Rescue Plan funds may have taken along the way.  Indeed, had Congress wanted states to ensure that none of the Rescue Plan funds touched a tax cut at all on their spending journey, it could have eliminated the word "net" from the statute and simply prohibited offsetting directly or indirectly any reductions in tax revenue.  But Congress did not do that.

And there's something else important about the concept of "net tax revenue."  "Net tax revenue" is tangible and can be measured only after it is collected.  In this way, "net tax revenue" is different from "expected net tax revenue," which is theoretical and does not yet exist.  No one would use the terms "expected net tax revenue" and "net tax revenue" interchangeably.  And Congress did not refer to the state's "expected net tax revenue"; it said the state's "net tax revenue."  Congress could have used the term "expected net tax revenue" if that's what it meant.  But it didn't.

22-10168          Rosenbaum, J., Dissenting          21

That brings us back to the comparative nature of the word "reduction." Again, a reduction can occur only relative to something that already exists. And because section 802(c)(2)(A) refers to a "reduction in the net tax revenue," the baseline "net tax revenue" against which any "reduction" must be compared must refer to a participating state's net tax revenue from sometime before the "covered period." After all, anything after the "covered period" began would not yet exist at the start of the "covered period," so we couldn't have a "reduction" in comparison to it.

As for the "covered period," we know that began on March 3, 2021, and continues until the last day of the state's fiscal year in which it spends or returns all Rescue Plan funds, or the Secretary recovers those funds. 42 U.S.C. § 802(c)(2)(A). In other words, the "covered period" extends to only that time during which Rescue Plan funds are outstanding.

And because the definition of "covered period" speaks of each state's fiscal year ("ends on the last day of the fiscal year of such State"), we know Congress directed states to measure in terms of their own fiscal years. So in sum, we know the baseline against which a state's "net tax revenue" in its fiscal year during the "covered period" is measured must be the state's own fiscal year that ended at a time before the "covered period" began.

Of course, another phrase modifies "net tax revenue of such State": "resulting from a change in law, regulation, or administrative interpretation during the covered period . . . ." *Id.* § 802(c)(2)(A). "Resulting from" means "[o]ccur[s] or follow[s] as

a consequence of something . . . ." *Result from*, OXFORD DICTIONARY (Sept. 12, 2023), https://premium.oxforddictionaries.com/us/definition/american_english/result  [https://perma.cc/DTS9-YEA5] That means only that net tax revenue of the participating state that comes because of "a change in law, regulation, or administrative interpretation during the covered period."

The next clause—"that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase"—modifies "a change in law . . . during the covered period."  This clause limits the applicability of section 802(c)(2)(A)'s prohibition on the use of Rescue Plan funds so that it applies to only those changes in a law, a regulation, or an administrative interpretation that reduce a tax or the imposition of a previously determined tax.

When we put it all together, then, the text of section 802(c)(2)(A) tells us several things.  First, Congress prohibited the use of Rescue Plan funds and only Rescue Plan funds—not other sources of state funding.  Second, the prohibition extended to only ultimately using those Rescue Plan funds to pay for state tax cuts or delay the imposition of state taxes that resulted in a reduction to net tax revenue, meaning that, when it comes to state tax cuts and delayed tax implementation, Congress was unconcerned with the individual routes expenditures of Rescue Plan allotments took, as long as the end result was not an overall reduction in net tax revenue caused by a state's tax cut or delayed implementation of a tax. Third, we measure whether a reduction in net tax revenue has

22-10168          ROSENBAUM, J., Dissenting          23

occurred because of a tax cut or delayed tax implementation—that is, our baseline—by reference to sometime before "the covered period" began, meaning before March 3, 2021. Fourth, we know from section 802(c)(2)(A) and the definition of "covered period" that our unit of measurement is the net tax revenue of the participating state in its own fiscal year.

So the baseline against which section 802(c)(2)(A) prohibits states from reducing their net tax revenue for a fiscal year in the "covered period" is the state's net tax revenue for its own fiscal year that ended sometime before March 3, 2021.

These observations about section 802(c)(2)(A)'s text alone address most of the panel opinion's ascertainability concerns about the statute.

Take the panel opinion's complaint that the prohibition on using Rescue Plan money to fund state tax cuts (section 802(c)(2)(A)) "does not provide a standard against which a state can assess whether it will reduce or has reduced net tax revenue." *West Virginia*, 59 F.4th at 1144. In elaborating on this concern, the panel opinion gives an example. *Id.* It supposes that a state legislature "predicts that consumption will increase in the next fiscal year and enacts a sales tax rate reduction based on its forecast that overall tax receipts will stay the same even if the rate is lower." *Id.* Under the panel opinion's hypothetical, the state's prediction turns out to be correct, so "year-over-year sales tax revenue stayed the same or grew despite the rate reduction." *Id.* The panel opinion worries that "if the baseline [against which we compare whether a

24                    ROSENBAUM, J., Dissenting                    22-10168

reduction in net tax revenue occurred] is what sales tax revenue *would have been* absent the tax cut, the legislature would have effectuated a 'reduction in the net tax revenue.'" *Id.*

This concern is demonstrably invalid. We know for two reasons that the baseline cannot be what the state predicted sales-tax revenue would have been before it enacted its budget, which is what the panel opinion's example suggests. First, the state's predicted sales-tax revenue would be a part of "expected net tax revenue," meaning it would be a hypothetical number, not actual and measurable "tax revenue." So in this scenario, the state's predicted sales-tax revenue would not exist before the "covered period" began. And we know that doesn't fly under section 802(c)(2)(A)'s text. Second, section 802(c)(2)(A) speaks in terms of "net tax revenue," or *total* tax revenue *after* expenses; it does not require tax-by-tax accounting, like the panel opinion's consideration of a cut to only the rate of the "sales tax revenue" suggests. So a state could permissibly cut the sales-tax rate—in fact, it could even eliminate it altogether—as long as it paid for any cut with a source of funds other than Rescue Plan money (or spending cuts or some combination of the two). That's because the text tells us the baseline must be the actual *"net* tax revenue" of a "fiscal year" that was complete before the "covered period," meaning before March 3, 2021.

The panel opinion's protestation that "the phrase 'directly or indirectly offset' seems 'extraordinarily expansive'" fares no better. *West Virginia*, 59 F.4th at 1145. For starters, that's not our call to make; it's Congress's. *See Diamond v. Chakrabarty*, 447 U.S. 303, 315

22-10168            ROSENBAUM, J., Dissenting            25

(1980) ("Broad general language is not necessarily ambiguous when congressional objectives require broad terms."). And in any case, the "directly or indirectly" text is not as broad as the panel opinion paints it. The panel opinion complains that the phrase "directly or indirectly" would allow the Secretary to find a state in violation of section (c)(2)(A)'s prohibition any time it makes a tax cut, regardless of whether the state ultimately pays for that tax cut with Rescue Plan funds. *See West Virginia*, 59 F.4th at 1145. In fact, the panel opinion boldly states that "one reasonable interpretation of [section 802(c)(2)(A)] is that it proscribes all tax cuts during the covered period." *Id.* at 1147.

Not so. That interpretation of section 802(c)(2)(A) is anything but "reasonable." The panel opinion stakes its doomsday interpretation that all tax cuts could be prohibited on the fungibility of money combined with the purported breadth of the phrase "indirect[] offset." *Id.* at 1145. Put them together, the argument goes, and a state's use of any Rescue Plan funds could eventually be connected downstream to any tax cut.

But the panel opinion has it backwards: the fungibility of money is exactly what makes the panel opinion's proposed interpretation implausible under the text. That's so for two reasons: the statutory text plainly limits the prohibition to (1) the use of Rescue Plan funds—and only Rescue Plan funds (not any and all sources of state income)—to (2) pay at the end of the day for a shortfall in only "net tax revenue"—not "any" tax revenue—that a tax cut or delayed tax implementation causes.

26                    ROSENBAUM, J., Dissenting                    22-10168

By now, we know that "net tax revenue" means the total tax revenue *after* accounting for all sources of income and all liabilities. It is a recognition that money is fungible and all that matters is whether a reduction in *net* tax revenue *ultimately* exists—that is, after all the calculations, in a year when a state has made a tax cut or delayed a tax's implementation. In other words, section 802(c)(2)(A) isn't interested in and doesn't care about any stops dollars may make along the way in a state's budget plan. All that matters is the bottom line: whether, after all the accounting is done, a state that has made tax cuts has a shortfall in net tax revenue that it's not possible to ultimately account for with sources of income or spending cuts other than Rescue Plan funds.

Contrary to the panel opinion's conclusion, section 802(c)(2)(A) does not even arguably purport to prohibit states from cutting taxes. If Congress sought to make Rescue Plan funds contingent on the elimination of all tax cuts,[7] Congress would have used far simpler language. But Congress didn't do that.

To interpret "directly or indirectly" as encompassing more than this—as including all tax cuts or spending increases anywhere in the budget, regardless of whether Rescue Plan money ultimately pays for them—is nonsensical. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 147 n.11 (2011) (rejecting, in the context of SEC Rule 10b-5, that use of "indirectly" within the phrase "directly or indirectly" "broaden[s] the meaning of 'make'"). Indeed,

---

[7] Because that's not what Congress did, I offer no comment on the constitutionality or unconstitutionality of any such proposal.

it is contrary to the provision's plain text and renders section 802(c)(2)(A) meaningless. *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) ("[W]e must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'"(citation omitted)).

The panel opinion also says the Rescue Plan's "novelty and scope compound" the first and second purported problems it raises. *West Virginia*, 59 F.4th at 1145. In the panel opinion's view, "Congress has aimed [section 802(c)(2)(A)'s] novel restriction at each state's *entire* budget and every single one of its taxes." *Id.*

I've already explained the flaws in the panel opinion's perceived first and second purported problems. And the exposure of those flaws shows why the panel opinion's complaint that section 802(c)(2)(A)'s restriction is "aimed . . . at each state's *entire* budget and every single one of its taxes" is just wrong.

Once again, the text of the prohibition on using Rescue Plan money to fund state tax cuts, by its terms, precludes the use of only *Rescue Plan* funds—not any other sources of income—to fund only state tax cuts. So states may cut whatever taxes they please, as long as they ultimately pay for those tax cuts using sources other than Rescue Plan funds. It's just not an accurate or even fair representation to say, as the panel opinion does, that section 802(c)(2)(A) imposes restrictions on "each state's *entire* budget and every single one of its taxes," *id.* Worse still, the panel opinion uses this incorrect and unreasonable description of section 802(c)(2)(A) as a

28                ROSENBAUM, J., Dissenting                22-10168

springboard to conclude later in the panel opinion that the major questions doctrine precludes us from being able to consider the Secretary's regulation to fill in any details. More on that later. For now, it's enough to point out that the panel opinion's pronouncements about the "novelty and scope" of the Rescue Plan are fallacious.

As for the meaning of section 802(c)(2)(A), the takeaway is simply this: that provision, by its terms, precludes states from using Rescue Plan funds to pay ultimately for state tax cuts that result during the "covered period" in a reduction in the state's net tax revenue as compared to its net tax revenue for a fiscal year that ended sometime before March 3, 2021.

The only question the text alone does not answer is which pre-March 3, 2021, fiscal year serves as the baseline. But as I explain below, our other tools readily provide the answer to that single remaining question.

### B.    The Rest of the Toolbox

The remaining tools in our statutory-interpretation toolbox include consulting the context, structure, history, and purpose of the provision, along with "common sense." *Abramski*, 573 U.S. at 179; *see also Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019) ("'[A] judicial interpreter [should] consider the entire text, in view of its structure and of the physical and logical relation of its many parts,' when interpreting any particular part of the text."). So when deciding whether the Rescue Plan's language is plain, we must "read the words in their context and with a view

to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 486 (2015) (internal quotation marks and citations omitted); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) (citing A. Scalia, A MATTER OF INTERPRETATION 37 (1997) ("In textual interpretation, context is everything.")).

As the Court has explained, "[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but also by] the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, (1997).  After all, "[t]o strip a word from its context is to strip that word of its meaning." *Biden*, 143 S. Ct. at 2378 (Barrett, J., concurring).  And when we consider context here, we can see that the baseline Congress imposed for determining whether a state used Rescue Plan money to pay for tax cuts after March 3, 2021, is the net tax revenue of the state's most recent full fiscal year before the United States declared the COVID-19 emergency.  We know this because at least two other parts of the Rescue Plan Act, including its purpose as derived from its text, and common sense tell us so.

Start with the Rescue Plan's purpose as derived from its text. Section 802(a), entitled "Appropriation," grants $219.8 billion to "make payments . . . to States . . . to mitigate the fiscal effects stemming from the public health emergency with respect to the Coronavirus Disease (COVID-19)." 42 U.S.C. § 802(a)(1).  In this section, Congress expressly announced the purpose of the Rescue Plan money:  "to mitigate the fiscal effects [on the States] stemming

from" the pandemic.  As relevant here, "mitigate" means "[t]o make less severe or intense; to make less harmful, unpleasant, or seriously bad." *Mitigate*, BLACK'S LAW DICTIONARY (11th ed. 2019). As for "fiscal," *Black's Law Dictionary* defines that as "1. [o]f, relating to, or involving financial matters <fiscal year>.  2. [o]f, relating to, or involving public finances or taxation <the city's sound fiscal policy>." *Fiscal*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Plugging these definitions into subsection (a) reveals Congress's intent to help the states lessen or compensate for the negative effects of the pandemic on the states' public finances.

So when we read section 802(c)(2)(A) in light of the Rescue Plan's purpose, there's only one way to discern "the fiscal effects [on the States] stemming from the public health emergency" using "net tax revenue" during a state's fiscal year as the comparative unit.  And that is to compare a state's net tax revenue during the pandemic (the "covered period") to that state's net tax revenue for the last full fiscal period before the United States declared the COVID-19 emergency on January 31, 2020—that is, the state's fiscal year 2019.  That's so for two reasons.

First, as I've mentioned, we know from the statutory text that the unit of measurement we're talking about is a state's fiscal year because the definition of "covered period" says so.  It would be odd (to say the least) to measure the "covered period" by fiscal years, a standard gauge for financial health, but net tax revenue by a different stick.  A period of less than a fiscal year would also tell

us little, if anything, about the state's financial condition before the pandemic hit.

Second, the best "net tax revenue" indicator of a state's financial health before the pandemic hit is the state's "net tax revenue" in the fiscal year that ended immediately before the pandemic began. Given the Rescue Plan's stated purpose to mitigate the effects of the pandemic (not enrich the states), it would make no sense to select some other pre-pandemic fiscal year. For the same reason, it would be illogical to use a baseline of a state's 2020 fiscal year, given that by the end of the states' fiscal years 2020, we were well into the throes of the COVID-19 emergency. So the measure of net tax revenue for a state's fiscal year 2020, as compared to a state's net tax revenue for fiscal years during the "covered period," would not reveal the fiscal effects of the pandemic on the states that Congress intended the Rescue Plan funds to mitigate.

And we construe statutes "in context, and with a modicum of common sense." *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2633 (2022) (Kagan, J., dissenting); *see also United States v. Bryant*, 996 F.3d 1243, 1252 (11th Cir. 2021). After all, "[c]ontext also includes common sense, which is another thing that 'goes without saying.'" *Biden*, 143 S. Ct. at 2379 (Barrett, J., concurring). In fact, we've described "the commonsense reading of the relevant statutory text" as "the anchor for statutory interpretation." *Bryant*, 996 F.3d at 1252 (citation and quotation marks omitted).

Here, the only fiscal year consistent with the rest of the Rescue Plan's context, not to mention common sense, is each state's fiscal year 2019.

To be sure, not all states' fiscal years are the same.[8] But that doesn't matter to our analysis because Congress chose the state's fiscal year as the unit of measure. And nothing prohibited Congress from doing so. In any case, every state calculates its net tax revenue each fiscal year.[9] So using as a baseline a number that states already have at their disposal makes eminent sense.

But it's not just the Rescue Plan's purpose and our common sense that compel the conclusion that Congress directed the use of the states' fiscal year 2019 net tax revenue as the baseline in section 802(c)(2)(A). Rather, reading section 802(c)(2)(A) in the context of the subsection in which it appears—subsection (c) "Requirements"—also independently shows that the baseline is the last full fiscal year of the state before the United States declared the COVID-19 emergency.

---

[8] Forty-six states begin their fiscal year on July 1; one starts April 1, one September 1, and one October 1. *FY 2023 State Budget Status*, NATIONAL CONFERENCE OF STATE LEGISLATURES (Sept. 12, 2023), https://www.ncsl.org/fiscal/fy-2023-state-budget-status [https://perma.cc/JHV9-EHTF].

[9] Not only that, but Congress specifically accounted for the fact that "[u]nlike the federal government, nearly every state is required to balance its budget" when it wrote the Rescue Plan. H.R. REP. NO. 117–7, at 397 (2021) (The Committee on Oversight's Findings and Recommendations).

Subsection (c) identifies the conditions by which the state must abide if it accepts funds under the Rescue Plan. Indeed, subsection (c)(1) says as much: *"Subject to paragraph (2)*, and except as provided in paragraphs (3), (4), and (5), a State . . . shall only use the funds provided under a payment made under this section . . . to cover costs incurred by the State . . ."* in the five ways set out in the statute. 42 U.S.C. § 802(c) (emphasis added).

A few things about subsection (c) stand out. First and foremost, subsection (c)(1) expressly "subject[s]" the list of authorized uses of Rescue Plan funds it sets forth to the limitations in subsection 802(c)(2). *Id.* § 802(c)(1) ("Subject to paragraph (2), . . . a State . . . shall only use the funds provided under a payment made under this section . . . ."). So we must read subsection 802(c)(2)(A) in conjunction with subsection (c)(1). That is, we must read subsections (c)(1) and (c)(2) together, not each in isolation, as the panel opinion considered subsection (c)(2).

When we do that, we can see that subsection 802(c)(1)(C)(i) authorizes the spending of Rescue Plan funds to provide government services equal to "the amount of the reduction in revenue of such State . . . due to the COVID-19 public health emergency relative to revenues collected in *the most recent full fiscal year of the State . . . prior to the emergency."* *Id.* § 802(c)(1)(C)(i) (emphasis added). In other words, this subsection expressly tells us the baseline by which to measure "reduction in revenue . . . due to the COVID-19 public health emergency." And the measure it designates is "the most recent full fiscal year of the State . . . prior to the

[COVID-19] emergency." This baseline, of course, makes perfect sense for reasons I've already noted: (1) it is a number that is readily accessible to each state; (2) it is a number that encompasses a regular financial interval that is large enough to provide a picture of a state's finances; and (3) because of its proximity in time to the start of the pandemic, it provides the best snapshot for determining how the pandemic affected the state's finances.

So when we read subsections (c)(2)(A) and (c)(1) together, as subsection (c)(1) commands us to do, subsection 802(c)(1) independently reveals that the baseline that subsection (c)(2)(A) refers to is the "most recent full fiscal year of the State . . . prior to the emergency." *Id.* After all, it would be strange to measure the effect of the COVID-19 emergency on state finances using different state fiscal years for purposes of authorizing distribution of Rescue Plan monies and for purposes of prohibiting expenditures of Rescue Plan monies. And it would be stranger still to do that in the same general subsection, subsection 802(c). So the reference in subsection (c)(2) to "reduction in the net tax revenue of such State" necessarily refers back to the "reduction in revenue of such State . . . due to the COVID-19 public health emergency relative to revenues collected in the most recent full fiscal year of the State . . . prior to the emergency" in subsection (c)(1)(C)(i).

To be sure, another court (though not the panel opinion), addressed this same issue and invoked what it described as the "typical presumption . . . that when Congress omits specific language in one provision that it includes in another, the omission implies a

22-10168            ROSENBAUM, J., Dissenting            35

*difference* in meaning between the two provisions." *Kentucky v. Yellen*, 54 F.4th 325, 351 n.18 (6th Cir. 2022). Relying solely on this rule of construction, the Sixth Circuit concluded that the Rescue Plan's failure to include the phrase "reduction in revenue of such State . . . due to the COVID-19 public health emergency relative to revenues collected in the most recent full fiscal year of the State . . . prior to the emergency" in subsection (c)(2) when it included it in subsection (c)(1)(C)(i) suggests that Congress intended that the baseline in subsection (c)(2) must be different from that in subsection (c)(1)(C)(i). *Id.* Most respectfully, I think that analysis is simply not correct.

First, the Sixth Circuit made this statement in a footnote, without conducting any other statutory analysis.

Second, the "typical presumption" that the Sixth Circuit invoked is not absolute. Indeed, any rule of construction "may be overcome by the strength of differing principles that point in other directions." A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 59 (2012).

Third, every other applicable principle requires the opposite conclusion—and strongly so. For starters, "[t]he text must be construed as a whole." *Id.* at 167. And as I've explained, reading section (c)(1)(C)(i) in conjunction with section (c)(2)(A), as section (c)(1) instructs us to do—and particularly in light of the Rescue Plan's purpose and statutory scheme—leads to only one plausible answer: section 802(c)(2)(A)'s baseline is each state's fiscal year 2019.

Not only that, but other key canons support the same answer. In that department, "[a]n interpretation that validates outweighs one that invalidates." *Id.* at 66. Reading subsection (c)(2)(A)'s baseline as the same as that set forth in subsection (c)(1)(C)(i) validates rather than invalidates the tax-cut-funding prohibition.

Relatedly, "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt." *Id.* at 247. Indeed, the Supreme Court has explained that "[n]o court ought, unless the terms of an act rendered it unavoidable, to give a construction to it which should involve a violation, however unintentional, of the constitution." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 562 (2012) (quoting *Parsons v. Bedford*, 28 U.S. 433, 448–49 (1830)). "[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Id.* at 563 (citing *Hooper v. Cal.*, 155 U.S. 648, 657 (1895)). For that reason, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." *I.N.S. v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)) (internal citation omitted).

We've also noted that "[p]roper respect for a co-ordinate branch of the government requires the courts of the United States to give effect to the presumption that Congress will pass no act not within its constitutional power." *Benning v. Georgia*, 391 F.3d 1299,

22-10168            ROSENBAUM, J., Dissenting            37

1303 (11th Cir. 2004) (citation and internal alteration omitted). Here again, reading subsection (c)(2)(A)'s baseline as the same as the state fiscal year set forth in subsection (c)(1)(C)(i) avoids placing its constitutionality in doubt.

And the fourth reason the Sixth Circuit's analysis does not stand up is the Rescue Plan's history—the remaining tool in our statutory-interpretation toolbox. "[S]pecifically with respect to this Act, rigorous application of [the presumption invoked by the Sixth Circuit] does not seem a particularly useful guide to a fair construction of the statute." *King*, 576 U.S. at 491 (discussing the Affordable Care Act). Like the Affordable Care Act, the Rescue Plan was the product of reconciliation, "a complicated budgetary procedure . . . which limited opportunities for debate and amendment." *Id.* at 491–92; American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat 4 (Mar. 11, 2021) ("Purpose"). Congress specifically relied on reconciliation to act "expeditiously" and avoid having the bill "languish indefinitely in the Senate, putting the health and well-being of millions of American families at risk." H.R. REP. NO. 117–7, at 2 (2021).

As a result, the Rescue Plan "does not reflect the type of care and deliberation that one might expect of such significant legislation." *King*, 576 U.S. at 492. But as the Supreme Court noted in *King*, "we must do our best, bearing in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id.*; *see also Clark v. Uebersee Finanz Korporation,*

*A.G.*, 332 U.S. 480, 488 (1947) (noting that when "[w]e are dealing with hasty legislation which Congress did not stop to perfect as an integrated whole[,] [o]ur task is to give all of it . . . the most harmonious, comprehensive meaning possible").

When we employ all the tools in our statutory-interpretation toolbox, section 802(c)(2)(A) is not ambiguous, vague, or unascertainable. Rather, the only fair reading of section 802(c)(2)(A)'s prohibition on using Rescue Plan money to fund state tax cuts is that it prohibits a participating state from using Rescue Plan funds to ultimately pay for a reduction in net tax revenue stemming from a tax cut or delayed imposition of a tax during the "covered period." And the last fiscal year ending before the United States declared the COVID-19 emergency on January 31, 2020, provides the baseline against which a state must compare its net tax revenue during the covered period.

That is certainly enough to satisfy *Pennhurst* and its progeny's interpretation of the constitutional ascertainability requirement. There is no question that the condition on spending Rescue Plan funds is "explicitly obvious" within the statute, and it provides a participating state with "the freedom to tailor compliance according to its particular . . . interests and circumstances." *Benning*, 391 F.3d at 1307 (citations omitted). "Congress is not required to list every factual instance in which a state will fail to comply with a condition. Such specificity would prove too onerous, and perhaps, impossible." *Id.* (citation omitted)); *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 666 (1985) ("*Pennhurst* does not suggest that the

Federal Government may recover misused *federal* funds only if every improper expenditure has been specifically identified and proscribed in advance." (emphasis in original)).

Thus, the panel opinion's failure to heed the Supreme Court's mandate to exhaust the statutory-interpretation toolbox before declaring a statutory provision ambiguous or unascertainable led the panel opinion to incorrectly declare section 802(c)(2)(A) unascertainable. As a court, we should have corrected this error. The panel opinion's refusal to consider anything but three dictionary definitions in isolation defies both Supreme Court and our statutory-interpretation jurisprudence. And it also invalidates a perfectly constitutional choice that Congress lawfully made. We lack the power to do that. But because the panel opinion does it anyway, it violates the separation of powers by invading the province of the legislature.

## III.

Yet the panel opinion was just warming up. The real action occurred next. In a usual *Chevron* analysis, when a statute contains an ambiguity, we consider any regulations the Secretary charged with administering the statute promulgated to construe that ambiguity. *Chevron*, 467 U.S. at 842–43. But that's not what happened here, even though the Secretary promulgated a rule implementing section 802(c)(2)(A). Rather, the panel opinion relied on its invalid construction of section 802(c)(2)(A) as its sole basis for concluding that that provision raises a "major question" that the Secretary cannot permissibly answer.

As an initial note, when we give section 802(c)(2)(A) its only plausible construction, we don't need to consider the Secretary's regulation to answer the question presented here. As I've explained, our statutory-interpretation toolbox shows us that section 802(c)(2)(A) bears only one plausible interpretation: it prohibits a participating state from using Rescue Plan funds to ultimately pay for a reduction in net tax revenue as compared to the state's net tax revenue in the last fiscal year ending before the United States declared the COVID-19 emergency.

But that's what makes the panel opinion's invocation of the major questions doctrine—an idea that some notable critics have referred to as a "get-out-of-text-free card[]," *Env't Prot. Agency*, 142 S. Ct. at 2641 (Kagan, J., dissenting)—all the more troubling here.

I'm getting ahead of myself, though. To play the major-questions-doctrine card, the panel opinion first laid down this incorrect proposition: "[O]ne reasonable interpretation of [section 802(c)(2)(A)] is that it proscribes all tax cuts during the covered period. On that reading, the [Rescue Plan] affects the states' sovereign authority to tax, and intrudes into an area that is the particular domain of state law." *West Virginia*, 59 F.4th at 1147 (citations omitted).

But we've already established that there is nothing "reasonable" about an interpretation of section 802(c)(2)(A) that claims it "proscribes all tax cuts during the covered period." *See supra* at 25. As a reminder, that interpretation necessarily ignores the words

22-10168            ROSENBAUM, J., Dissenting            41

"funds provided under this section" (meaning Rescue Plan funds) and "net tax revenue" in section 802(c)(2)(A). *See id.*

Yet the panel opinion relied solely on this invalid interpretation of section 802(c)(2)(A) to justify its invocation of the major questions doctrine. It said, "The choice between that [(erroneous)] reading and a narrower one is a major question, such that Congress had to speak in a 'specific and detailed' way if it intended to delegate the authority to answer that question." *West Virginia*, 59 F.4th at 1147.

That, of course, is just wrong. Congress didn't "intend[] to delegate the authority to answer that question" because that question is fictional. There is no "choice" that can be made between the panel opinion's implausible "reading" of section 802(c)(2)(A) that prohibits states from making any tax cuts and the so-called "narrower one" that prohibits states from using Rescue Plan money to fund only tax cuts or delayed tax implementations that result in a reduction in "net tax revenue." As we all know by now, the only plausible interpretation of section 802(c)(2)(A) is that it doesn't prohibit all tax cuts; rather, it precludes states from using Rescue Plan funds—and only Rescue Plan funds—to pay for shortfalls in "net tax revenue" caused by a tax reduction or a delayed tax increase. Again, states are free to make any tax cuts they desire. They just can't use Rescue Plan money to fund those tax cuts. Instead, states must pay for those tax cuts as they would have in the absence of Rescue Plan money—that is, with other income sources or spending cuts.

Once the false all-tax-cuts-prohibited card falls, so does any basis for invoking the major questions doctrine. Because section 802(c)(2)(A) can plausibly bear only the narrower interpretation this opinion explains, by definition, no choice between a broad and narrow reading of the provision exists. And the whole major-questions-doctrine house of cards comes crashing down.

In other words, the panel opinion wrongly invoked the major questions doctrine based on a faulty premise. After all, there's no reason to ponder whether we can even consider the Secretary's regulations when the statutory text provides only one plausible answer to the only question presented. That's game over.

Or at least it should have been. Compounding its mistake, though, the panel opinion then relied on its erroneous interpretation as the sole basis to extend the use of the major questions doctrine into previously uncharted territory. In this respect, the panel opinion, citing *King,* said that "[i]f the availability of a tax credit is a major question that cannot be delegated by generic language, . . . then the same is true for the way the offset provision applies to the States' budget process." *Id.* at 1147 (citing *King,* 576 U.S. at 485–86). Even setting aside the faulty premise on which the panel opinion incorrectly invoked the major questions doctrine, the panel opinion's decision to extend the major questions doctrine to the Secretary's regulations implementing section 802(c)(2)(A) is wrong for at least four other reasons.

*First*, the Secretary's rule applying section 802(c)(2)(A) does not come within the category of cases the Supreme Court

identified as subject to the major questions doctrine when the Court relied on that doctrine to invalidate the Internal Revenue Service's rule implementing the Affordable Care Act's tax credit in *King*. In *King*, the Supreme Court invoked the major questions doctrine after reasoning that "[t]he tax credits [at issue there] [we]re among the [Affordable Care] Act's key reforms, involving billions of dollars in spending each year and affecting the price of health insurance for missions of people. Whether those credits [we]re available on Federal Exchanges [wa]s thus a question of deep 'economic and political significance' that [wa]s central to th[e] [Affordable Care Act] statutory scheme . . . ." 576 U.S. at 485–86. On top of that, the Supreme Court continued, "[i]t [wa]s especially unlikely that Congress would have delegated [a key reform in the Affordable Care Act] to the IRS, which has no expertise in crafting health insurance policy of this sort." 576 U.S. at 486, 497.

Those circumstances just don't apply here. In *King*, the Affordable Care Act provided no answer to whether tax credits were available on Federal Exchanges—and any answer to that question had significant economic and political effects. In other words, exhaustive review of the statutory provision at issue in *King* left the Court with a major question. But here, the Rescue Plan itself answers the questions this case poses—those are, whether section 802(c)(2)(A) puts states on notice as to whether they may make tax cuts during the covered period if they receive Rescue Plan funds, and if so, how will the federal government measure whether a state that makes tax cuts during the "covered period" has used Rescue Plan money to fund those tax cuts.

44                    ROSENBAUM, J., Dissenting                    22-10168

As we know, section 802(c)(2)(A) responds to those questions by recognizing that states may make tax cuts as long as they don't pay for those tax cuts with Rescue Plan money and by establishing the state's own fiscal year 2019 net tax revenue as the baseline against which net tax revenue in years when a state receives Rescue Plan money and makes tax cuts is to be measured. And unlike in *King*, there is no other open question that requires considering the regulations. Even the panel opinion fails to identify any other question at issue in this case. It should go without saying that if no question remains, there can be no major question to which we may apply the major questions doctrine. For this reason alone, the panel opinion's comparison of section 802(c)(2)(A) to the tax-credit provision in the Affordable Care Act cannot be valid.

Besides that, unlike the healthcare insurance policy question that the Affordable Care Act purported to delegate to the IRS to answer by regulation, here, Congress's delegation falls well within the Secretary's wheelhouse: the Secretary's regulation concerns grants of Treasury funds that her own department wholly administers. And unlike the delegation resulting in the Affordable Care Act tax-credit regulation, the Secretary's regulatory authority here affects the same people or entities—in this case, states—as the statute does: those that have elected to participate in the Rescue Plan program. In short, applying the major questions doctrine here is not the same thing at all as applying it in *King*.

*Second*, the circumstances here don't resemble any other cases in which the Supreme Court has relied on the major

22-10168          ROSENBAUM, J., Dissenting          45

questions doctrine.   In *West Virginia v. Environmental Protection Agency*, the Court defined the thrust of the major questions doctrine as addressing the recurring problem of "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted."  142 S. Ct. at 2609.  In its analysis, the Court collected cases analyzing major questions, citing some "common threads" in applications of the doctrine.  *Id.* at 2607–09

The Court found delegation issues where an agency repurposed a statute to serve a new aim not articulated by Congress.  *See e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–61 (2000) (rejecting the Food and Drug Administration's assertion that its authority over "drugs" and "devices" included the power to regulate tobacco products); *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (rejecting the Attorney General's assertion that the power to revoke a physician's registration to prescribe Schedule II drugs where "inconsistent with the public interest" did not include the power to revoke licenses for assisting suicide where legal under state law); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 665 (2022) (invalidating OSHA's vaccinate-or-test mandate because OSHA had "never before adopted a broad public health regulation of this kind").

Another category of major-questions cases involved agency invocation of "extravagant statutory power over the national economy," affecting a broad swath of the economy not previously regulated by the agency.  *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573

U.S. 302, 324 (2014) (declining to uphold the EPA's definition of "air pollutant" where it would give EPA permitting authority over "a significant portion of the American economy").

Finally, the Court cited cases in which agencies both repurposed a statute *and* regulated a broad swath of the economy previously untouched. *See e.g.*, *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (rejecting the Center for Disease Control's assertion that its power to prevent the spread of communicable diseases included the power to impose a rent moratorium); *see also Biden*, 143 S. Ct. at 2373–75 (striking down the Secretary of Education's student loan forgiveness measures where the waivers and modifications would "fundamental[ly] revis[e]" the federal student financial aid scheme, and the measures would cost taxpayers hundreds of billions of dollars).

None of these threads are present here. The Secretary did not repurpose the Rescue Plan. Rather, she implemented regulations consistent with Congress's command under the provision prohibiting use of Rescue Plan money to fund state tax cuts, and she did so shortly after Congress enacted the Rescue Plan. Nor did the Secretary rely on an old statute or authority to take unprecedented action affecting a large swath of the American economy not previously regulated. To the contrary, the Secretary promulgated the regulation mere months after the Rescue Plan was enacted, and the regulation affects only the states that had voluntarily agreed to take Rescue Plan money. Not only that, but the regulation pertains

22-10168            ROSENBAUM, J., Dissenting                47

to only how states spend Rescue Plan *money*, not any other sources of income the states may have.

*Third*, the panel opinion does not explain how this case is otherwise so extraordinary as to require the application of the major questions doctrine's termination of a statutory provision with extreme prejudice. The panel opinion refers to the "novelty and scope" of the Rescue Plan and says that section 802(c)(2)(A) "undoubtedly implicates questions of deep economic and political significance and alters the traditional balance of federalism by imposing a condition on a state's entire budget process." *West Virginia*, 59 F.4th at 1146.

But as I've just explained, section 802(c)(2)(A) leaves no question this case asks unanswered. How does prohibiting states that have voluntarily chosen to receive Rescue Plan funds from using those funds to pay for state tax cuts raise "questions of deep economic and political significance" that Congress did not already answer when it enacted the Rescue Plan? And what are these "questions of deep economic and political significance"?

The panel opinion doesn't say. And it doesn't explain how the Rescue Plan's limited prohibition on using Rescue Plan money to fund state tax cuts "impos[es] a condition on a state's entire budget process" that "alters the traditional balance of federalism." After all, even states that choose to participate in the Rescue Plan remain free to make any tax cuts they desire and to pay for those tax cuts in their budget in any way they wish, as long as they don't

48                    ROSENBAUM, J., Dissenting                    22-10168

ultimately use federal Rescue Plan money to cover the cost of the state tax cuts.

What's more, the purported "novelty and scope," standing alone, of the Rescue Plan are the wrong focus in any major-questions analysis. Rather, though the major questions doctrine concerns itself with cases involving questions of "'such magnitude and consequence' on a matter of 'earnest and profound debate across the country,'" the doctrine focuses on whether Congress itself has clearly conveyed a policy decision directly through its legislation or has clearly delegated any such decision to an agency (as opposed to Congress's failure to directly make a decision in its legislation or to clearly delegate a specific decision to an agency). *Biden*, 143 S. Ct. at 2374 (quoting *Env't Prot. Agency*, 142 S. Ct. at 2616, 2620). And here, Congress *did* speak. As Section II of this opinion shows, it spoke clearly in section 802(c)(2)(A), fully answering the questions before us. So the major-questions doctrine's concern about ensuring that Congress—and not an agency—makes significant decisions does not arise here.

And *fourth*, section 802(c)(2)(A), which allows states to receive federal funding subject to a specified condition, is precisely the type of legislation that the Supreme Court has repeatedly upheld under the Spending Clause. *See, e.g.*, *Bennett*, 470 U.S. at 659 (upholding a federal grant system that prohibited states from using funds provided "merely to replace state and local expenditures"); *Brock v. Pierce Cnty.*, 476 U.S. 253, 254 (1986) (upholding the Secretary of Labor's right to recoup misspent funds granted under the

22-10168            ROSENBAUM, J., Dissenting            49

Comprehensive Employment and Training Act); *Bell v. New Jersey*, 461 U.S. 773, 782 (1983) (holding that the Elementary and Secondary Education Act "contemplated that States misusing federal funds would incur a debt to the Federal Government for the amount misused"). There is nothing new or materially different about section 802(c)(2)(A) of the Rescue Plan.

In short, the major questions doctrine has no application in this case, and the panel opinion wrongly invoked it to invalidate statutorily discernible congressional intent.

One final point: As I've mentioned, the only questions at issue here are whether section 802(c)(2)(A) puts states on notice as to whether they may make tax cuts during the covered period if they receive Rescue Plan funds, and if so, how the federal government will measure whether a state that makes tax cuts during the "covered period" has used Rescue Plan money to fund those tax cuts. Section II of this dissent shows that the answer to those questions is that states that receive Rescue Plan money may cut taxes, but they can't use Rescue Plan money to pay for those tax cuts. And we determine whether a state has violated this prohibition by comparing its net tax revenue during the given fiscal year of the covered period to its net tax revenue during the state's fiscal year 2019. As for the mechanics of implementing section 802(c)(2)(A)'s unambiguous prohibition, that question is not before us in this case because no state claims that the Secretary violated section 802(c)(2)(A) in enforcing that section's prohibition on spending Rescue Plan money to fund state tax cuts during the covered period.

Still, though, 42 U.S.C. § 802(f) empowers the Secretary "to issue such regulations as may be necessary or appropriate to carry out [the Rescue Plan]." And any regulation that sets out the step-by-step details of carrying out Congress's command in section 42 U.S.C. § 802(c)(2)(A) would fall into that category. As it turns out, that's precisely what the Secretary's regulation does, and under *Chevron*, we owe it deference.

For starters, in the Rescue Plan, Congress expressly authorized the Secretary to "issue such regulations as may be necessary or appropriate to carry out this section." 42 U.S.C. § 802(f). Not only that, but the Secretary promulgated the regulation here through notice and comment.[10] Specifically, the Secretary first issued her regulation as an interim final rule, 86 FED. REG. 26786, 26807–11 (May 17, 2021), and then later, after responding to

---

[10] To be sure, given the emergency situation, the Secretary relied on an expedited procedure. *See* 86 FED. REG. 26786, 26818; *see, e.g.*, *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1262 (11th Cir. 2020) (applying *Chevron* deference to two interim final rules promulgated without regard to notice requirements "due to the burgeoning economic crisis" caused by the pandemic); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1289–90 (11th Cir. 2021) (dispensing with the notice-and-comment requirement for a vaccine mandate regulation because of "the ongoing pandemic"). As relevant here, the Administrative Procedure Act provides for an exception to the notice-and-comment requirement "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). That happened here.

22-10168          Rosenbaum, J., Dissenting          51

comments, and with no material changes, she issued it as a final rule, 87 Fed. Reg. 4338-01, 4423–29 (Jan. 27, 2022).

When an agency uses the notice-and-comment rulemaking procedure, it is "a 'significant' sign that a rule merits *Chevron* deference." *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 57–58 (2011). Together with Congress's express statutory delegation of rulemaking authority to the Secretary in the Rescue Plan, this indicates that Congress "would have intended, and expected, courts to treat [the regulation] as within . . . its delegation to the agency of 'gap-filling' authority." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173 (2007).

With the preliminary boxes checked, I consider the content of the Secretary's regulation. And when we look at that, we see that the only differences between the regulation and section 802(c)(2)(A) are (1) the Secretary's allowance for a safe harbor for states with a de minimis (less than one percent) reduction to their net tax revenue resulting from a tax cut or delayed tax implementation during the covered period, 87 Fed. Reg. 4338-01, 4427 (Jan. 27, 2022), and (2) the Secretary's allowance for recipients to report "actual values" or "estimated values produced by a budget model" for covered changes that reduce tax revenue, *id.* at 4426. Otherwise, the Secretary's regulation merely reduces to a four-step procedure precisely what section 802(c)(2)(A) requires: mathematically determining whether a state has used Rescue Plan funds to pay for a tax cut during the covered period, that resulted in a reduction to the state's net tax revenue during the covered period,

compared to the state's fiscal year 2019 net tax revenue.  The regulation's near identicality to section 802(c)(2)(A) certainly renders it a permissible implementation of section 802(c)(2)(A).

## IV.

The American Rescue Plan Act provided states with the opportunity to choose whether they wished to accept federal monies to relieve COVID-related economic conditions in ways that the Rescue Plan specified.  As relevant here, the Rescue Plan demanded one thing in return for those billions of dollars in aid:  states could not use Rescue Plan money to fund state tax cuts that resulted in a reduction in net tax revenue as compared to the state's net tax revenue from fiscal year 2019.  By the terms of the Rescue Plan itself, nothing in the Rescue Plan prevented the participating states from making tax cuts; they just couldn't use Rescue Plan money to ultimately fund those cuts.  The Rescue Plan makes that condition perfectly ascertainable to anyone who conducts a thorough statutory analysis employing all the statutory-interpretation tools in our toolbox.

But the panel opinion quit its statutory analysis after consulting only the dictionary definitions of three words in isolation from the rest of section 802(c)(2)(A).  That's no way to conduct statutory analysis.  And it's hard to imagine that this Court would stand for such a slapdash analysis in any other case.  Yet the Court gives the panel opinion a pass even though it's clear the panel opinion's methodology flunks Statutory Interpretation 101.

And here, that undeserved pass has real consequences.  The panel opinion's failure to comport with Supreme Court jurisprudence on statutory interpretation led the panel opinion to wrongly invalidate section 802(c)(2)(A)'s ascertainable condition.  Worse, the panel opinion's demonstrably incorrect construction of section 802(c)(2)(A) to prohibit states participating in the Rescue Plan from making any tax cuts whatsoever also served as the panel opinion's sole justification for its inappropriate application and expansion of the major questions doctrine.  Ironically, even as the panel opinion invalidated a perfectly valid congressional enactment, it invoked the separation of powers to (incorrectly) justify its actions.

As a result, states may now spend Rescue Plan money to fund state tax cuts that result in a reduction in net tax revenue, as compared to the state's fiscal year 2019 net tax revenue, in violation of Congress's express command.  I respectfully dissent from the denial of rehearing en banc.